UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 04-3161 (JRT/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **UNITED STATES OF AMERICA'S** |
| | ) | **POST-HEARING MEMORANDUM** |
| LUCAS HELDER, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

The United States of America, by its undersigned counsel, submits this Post-Hearing Memorandum in accordance with the Court's instructions at the close of the mental commitment hearing held on September 1, 2004.

## I.  INTRODUCTION

The United States of America petitions the Court under 18 U.S.C. § 4246 to determine the present mental condition of Lucas Helder ("Helder").  The United States seeks an Order committing Helder to the custody of the Attorney General for hospitalization and continued treatment.  The United States maintains that Helder suffers from a mental disease or defect such that his release from custody would create a substantial risk of bodily injury to others or serious property damage as a result of his mental illness.

A hearing was held on September 1, 2004 at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester").  The United States called two witnesses and introduced 17 exhibits into evidence.  Exhibits 2-16 were placed under seal by the Court.  Helder was present throughout the hearing but did not testify or call any witnesses.  At the conclusion of the hearing, the Court requested that the parties brief two issues:

1.      Should Helder be committed to the custody of the Attorney General for continued hospitalization and treatment until suitable state placement may be found, or until his release no longer constitutes a substantial risk of bodily injury of another person or serious damage to the property of another?

2.      Should Exhibits 2-16 remain under seal?

For the reasons discussed below, the United States submits that it has met its burden under 18 U.S.C. § 4246 and that the Court should unseal Exhibits 2-16.

## II.  DISCUSSION

A.      <u>Helder Should Be Committed to the Custody of the Attorney General</u>

18 U.S.C. § 4246 provides for the indefinite hospitalization of a person who has been found incompetent to stand trial and is due for release but who, as the result of a mental illness, poses a significant danger to the general public.  *United States v. S.A.*, 129 F.3d 995, 998 (8th cir. 1997)(citing United *States v. Steil*, 916 F.2d 485, 487 (8th Cir. 1991)).  Under § 4246, the United States must show by clear and convincing evidence that (1) the prisoner has a mental disease or defect, (2) that he would be dangerous if released, and (3) that there is no suitable state placement available.  *S.A.*, 129 F.3d at 998.  If the government establishes these elements of proof, the prisoner is involuntarily committed to the Attorney General's custody.  *Id*.  The government has met its burden in this case.

1. The United States has shown by clear and convincing evidence that Helder presently suffers from a mental disease or defect

Helder was born in St. Paul, Minnesota and adopted as a infant by his current parents.  He was raised in Pine Island, Minnesota.  Records indicate that Helder had a relatively pleasant and unremarkable childhood.

Helder graduated from Pine Island High School in 1999. He was an above-average student and active in extracurricular sports. During high school, Helder attended Rochester Community and Technical College and, upon graduation, transferred to the University of Wisconsin-Stout, where he completed five semesters.

In May 2002, prompted by what he believed to be a message from President George W. Bush, Helder embarked on a 5 day journey placing 18 pipe bombs in mailboxes in Illinois, Iowa, Nebraska, Texas, and Colorado. Several of the bombs exploded, resulting in injuries.[1] Helder was arrested after a high-speed car chase outside of Reno, Nevada.

Helder was charged by the U.S. Attorney's Office in the Northern District of Iowa with Malicious Destruction of Property by Means of Explosive and Using a Destructive Device in a Crime of Violence. The United States District Court for the Northern District of Iowa ordered that Helder undergo evaluation at FMC Rochester to determine if he was competent to stand trial.

In April 2003, doctors at FMC Rochester diagnosed Helder with schizoaffective disorder, bipolar type and concluded that Helder was not competent to stand trial. This finding was consistent with two other evaluations conducted by Dr. John Mundt and Dr. Thomas Harmon at the request of Helder's Federal Public Defender in Iowa.

FMC Rochester conducted additional forensic evaluations at the request of the Iowa District Court in August 2003 and January 2004. Helder's diagnoses remained the same. After each evaluation, the District Court in Iowa concluded that Helder remained incompetent to stand trial and was unlikely to be restored to competency in the foreseeable future. In April 2004, the Iowa District

---

[1] Helder intended to place the bombs in sites across the country in the pattern of a "smiley face." The "smiley face" was intended to communicate to people that his message was one of love and caring and that people should not be alarmed. Hence, the frequent reference to Helder as the "smiley face bomber."

3

Court referred Helder to FMC Rochester for a risk assessment pursuant to 18 U.S.C. § 4246. On July 8, 2004, after the completion of the risk assessment, the United States filed the pending petition.

The government presented the testimony of two witnesses at the hearing on September 1; Dr. Andrew Simcox, the Chief of Psychology at FMC Rochester,[2] and Pam Young, a licensed social worker at FMC Rochester. Dr. Simcox evaluated Helder on numerous occasions and continues to monitor his status. Dr. Simcox participated in three forensic evaluations (Exhibit 2, 5 and 6) and also was a member of the risk assessment panel (Exhibit 16). At the September 1, 2004 hearing, Dr. Simcox opined within a reasonable decree of medical certainty that Helder suffers from a mental disease, namely schizoaffective disorder, bipolar type. His colleagues at FMC Rochester all concur in this diagnosis.

Dr. Simcox testified that the essential feature of schizoaffective disorder is an uninterrupted period of illness during which, at some time, there is a major depressive, manic, or mixed episode concurrent with symptoms of schizophrenia involving at least two of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms such as reduced logic or inappropriate affect. In Helder's case, Dr. Simcox testified that Helder displayed various symptoms of schizophrenia: delusions, hallucinations, disorganized speech and behavior, breaks in logic, and inappropriate affect.

Dr. Simcox also testified that the criteria for a manic episode included an abnormally elevated, expansive, or irritable mood, lasting at least one week, and including at least three of the following symptoms: inflated self-esteem or grandiosity, decreased need for sleep, more talkative

---

[2] Dr. Simcox was accepted by the Court as an expert in the field of psychology based upon the stipulation of the parties. His curriculum vitae was entered into evidence without objection as Exhibit 1 and was not sealed.

than usual or pressured speech, flights of ideas or racing thoughts, distractability, hyperactivity, and increase in pleasurable but risky behaviors (sexual behaviors, purchasing, or foolish investments). Dr. Simcox testified that around the time of the offense, Helder displayed grandiosity, minimal need for sleep, distractability, and hyperactivity, and continues to display grandiosity, distractability, and, at time, pressured speech.

Dr. Simcox testified that Helder's delusional beliefs are a central component of his mental illness. The delusions include Helder's belief in such concepts as ascension, astral protection, oneness, the absence of death, the 100th monkey syndrome, and the world authority. Dr. Simcox testified that Helder frequently talks about his beliefs with FMC Rochester staff, and has also written about them at the request of the medical staff. Helder describes these beliefs in some detail in Exhibits 9-15.

Dr. Simcox testified that Helder does not believe he has a mental disease. Nevertheless, Helder is willing to give the medical staff the benefit of the doubt and therefore has been compliant with his medications. Dr. Simcox testified that, to date, Helder's medications have had little effect, but that FMC Rochester staff continue to try different antipsychotic medications. Dr. Simcox testified that Helder's prognosis is poor without effective medication and other forms of treatment.

Dr. Simcox's testimony and medical opinion, along with the records admitted into evidence, establish by clear and convincing evidence that Helder suffers from a mental disease, namely, schizoaffective disorder, bipolar type. Of particular force is the fact that every professional to evaluate Helder to date has determined that he suffers from a mental disease. Helder has offered no evidence to contradict these findings. Such uncontradicted evidence is compelling. *See, e.g. United States v. Steil*, 916 F.2d 485, 488 (8th Cir. 1990)(finding significant the fact that five mental health

professional found Steil mentally ill with no medical opinion to the contrary). In the absence of any countervailing medical evidence, this Court should find that the United States has met its burden of proof with respect to the first element of 18 U.S.C. § 4246.

>    2. The United States has established by clear and convincing evidence that Helder's release would create a substantial risk of bodily injury to another or serious damage to property of another, and that his mental illness causes the substantial risk of harm

To succeed under 18 U.S.C. § 4246, the United States must also show that Helder's release would create a substantial risk of bodily injury to another or serious damage to property of another, and that his mental illness causes the substantial risk of harm. Based on his continuing evaluations of Helder, Dr. Simcox opined within a reasonable degree of medical certainty that Helder's release would create a substantial risk of bodily injury or serious damage to property. No contrary evidence was presented at the hearing.

Dr. Simcox based his opinion on certain predictors used to determine whether someone's mental illness poses a risk of harm. The three main factors Dr. Simcox identified are: (1) history of violence; (2) violence related to mental illness; and (3) present mental state. Dr. Simcox testified that Helder's five-day bombing spree clearly evidences a history of violence. Dr. Simcox also testified that Helder's mental illness was the motivating factor for his actions. Finally, Dr. Simcox testified that Helder continues to maintain essentially the same belief system that prompted the May 2002 bombings. Thus, based on these three factors, Dr. Simcox opined that Helder presents a danger to others.

Dr. Simcox also discussed other factors that support a finding that Helder poses a danger to society. These include: (1) history of drug use; (2) previous use of a weapon; (3) history of not

6

taking prescribed medications, and (4) identified potential targets of delusions.[3] Dr. Simcox testified that Helder used marijuana extensively and that he would likely continue to do so if released because it enhances his delusional beliefs.  He also noted that Helder blew up at least one mailbox while a teenager, planted 18 bombs in May 2002, and possessed a gun at the time of his arrest.  With respect to the third predictor, Dr. Simcox noted that while Helder has been taking his medications, he does not believe he has a mental illness and only takes his medication because he is instructed to do so. Dr. Simcox testified that it was likely Helder would not continue to take his medication if released. Finally, Dr. Simcox noted that the identified potential targets of Helder's delusions encompass the public at large, thus making it more difficult to predict who he will harm and whether he is realistically capable of harming his targets.

Dr. Simcox acknowledged that Helder is in many respects a model inmate who has shown no aggressive behavior during his incarceration at FMC Rochester.  He testified, however, that it is not a pattern of on-going aggressive behavior that causes Helder to be a danger.  Instead, it is Helder's delusional belief system, coupled with the predictors discussed above, that cause Helder to present a danger to society.  Moreover, the fact that Helder does not show overt signs of aggression does not undermine the determination that he is dangerous.  The Eighth Circuit has made clear that merely because an inmate does not engage in violent conduct in the institutional setting does not preclude a finding of dangerousness.  The court has repeatedly stated that "[o]vert acts of violence are not required to prove dangerousness." *United States v. LeClair*, 338 F.3d 882, 885 (8th Cir. 2003)(citing *United States v. Steil*, 916 F.2d 485, 487-88 (8th Cir. 1990)).  *See also Ecker*, 30

---

[3]     These factors are identified in *United States v. Ecker*, 30 F.3d 966 (8th Cir. 1994), as reliable predictors of dangerousness.

F.3d at 966 (holding where last assault occurred ten years ago and no assault in three years of confinement did not require a conclusion of not dangerous).

The Eighth Circuit recognizes that courts are entrusted with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe.'" *United States v. Bilyk*, 949 F.2d 259, 261 (8th Cir. 1991)(quoting *United States v. Clark*, 893 F.2d 1277, 1282 (11th Cir.1990)). The testimony and exhibits received into evidence by this Court establish by clear and convincing evidence that Helder's release would create a substantial risk of bodily injury or serious damage to property. Helder's delusional belief system, coupled with the other predictors about which Dr. Simcox testified, support such a finding. *Ecker*, 30 F.3d at 966.

### 3. The United States has shown by clear and convincing evidence that no suitable state placement is currently available

Finally, in order to prevail under 18 U.S.C. § 4246, the United States must establish that no suitable state placement is currently available for Helder. Pam Young, a licensed social worker whose duties include finding state placement for inmates, testified that the State of Minnesota has been unwilling to accept Helder in one of its institutions. Ms. Young testified that the Minnesota has been unwilling to accept Helder because he does not meet the state's legal requirements for mental commitment. Ms. Young continues to seek state placement for Helder but at this juncture is not hopeful such placement will be found in the immediate future.

In sum, the government has established by clear and convincing evidence the three elements necessary to commit Helder under 18 U.S.C. § 4246. This Court should therefore commit Helder to the custody of the Attorney General for continued hospitalization and treatment until suitable state placement may be found, or until his release no longer constitutes a substantial risk of bodily injury to another person or serious damage to the property of another.

B.      Exhibits 2-16 Should Be Unsealed

At the conclusion of the September 1 hearing, the Court, at the request of Helder's counsel, placed Exhibits 2-16 under seal.[4]  Helder requests that Exhibits 2-16 remain under seal.  These exhibits are essentially of two types: Exhibits 2-8 and 16 are medical reports, forensic evaluations, psychiatric and psychosocial evaluations, and a risk assessment.  Exhibits 9-15 are Helder's essays about some of his beliefs. All of the records are contained in Helder's medical file and were relied upon by Dr. Simcox in rendering his opinions.

Because courts have distinguished between civil and criminal proceedings when it comes to the issue of access to court records, it is important to first identify whether a hearing under 18 U.S.C. § 4246 is a criminal or civil proceeding.  Although the relevant statute is found under Title 18 and involves the liberty interest of the respondent, the Eighth Circuit has treated § 4246 hearings as civil proceedings.  *Sell v. United States*, 539 U.S. 166, 182 (2003)(referring to § 4246 as a civil proceedings).  *See also United States v. Sahhar*, 917 F.2d 1197, 1205 (9th Cir. 1990)(same)(citing *Allen v. Illinois*, 478 U.S. 364, 370 (1986) and *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

The United States Supreme Court has not decided whether the First Amendment guarantees the public access to court records in civil proceedings.  *See, e.g., Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1330-31 (1985).[5]  Nonetheless, the Court has long recognized a common law right of access:

It is clear that the courts of this country recognize a general right to inspect

---

[4]      In addition to Exhibit 1, the Court did not seal Exhibit17 -- Pam Young's curriculum vitae.

[5]      Lower courts differ on whether a First Amendment right of access to court records exists. *Compare, e.g., Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983), *cert. denied*, 465 U.S. 1100 (1984)(recognizing First Amendment right of access), *with Reporters Committee for Freedom of the Press*, 773 F.2d 1325, 1331-1334 (D.C. Cir. 1985)(no First Amendment right of access).

and copy public records and documents, including judicial records and documents. In contrast to the English practice, *see, e.g., Browne v. Cummings*, 10 B. & C. 70, 109 Eng.Rep. 377 (K.B. 1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, *see, e.g.*, *State ex rel. Colscott v. King*, 154 Ind. 621, 621-27, 57 N.E. 535, 536-38 (1900); *State ex rel. Ferry v. Williams*, 41 N.J.L. 332, 336-39 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, *see, e.g., State ex rel. Youmans. v Owens*, 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). *But see Burton v. Reynolds*, 110 Mich 354, 68 N.W. 217 (1896).

It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." *In re Caswell*, 18 R.I. 835, 836, 29 A. 259 (1893). *Accord, e.g.*, *C. v. C.*, 320 A.2d 717, 723, 727 (Del. 1974). *See also King v. King*, 25 Wyo. 275, 168 P. 730 (1917). Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, *Park v. Detroit Free Press Co.*, 72 Mich. 560, 568, 40 N.W. 731, 734-35 (1888); *see Cowley v. Pulsifer*, 137 Mass. 392, 395 (1884)(per Holmes, J.); *Munzer v. Blaisdell*, 268 App. Div. 9, 11, 48 N.Y.S.2d 355, 356 (1944); *see also Sanford v. Boston Herald-Traveler Corp.*, 318 Mass. 156, 158, 61 N.E.2d 5, 6 (1945), or as sources of business information that might harm a litigant's competitive standing, *see, e.g., Schmedding v. May*, 85 Mich. 1, 5-6, 48 N.W. 201, 202 (1891), *Flexmir, Inc. v. Herman*, 40 A.2d 799, 800 (N.J. Ch. 1945).

*Nixon v. Warner Communications*, 435 U.S. 589, 597-98 (1978).[6]

---

[6]    The court in *United States v. Hubbard*, 650 F.2d 293, 315 n.79 (Cir. D.C. 1981), observed that the common law right of court access is not some arcane relic of ancient English law:

> To the contrary, the right is fundamental to a democratic state. As James Madison warned, "A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy: or perhaps both. . . . A people who mean to be their own Governors, must arm themselves with the power which

The common law right of access to judicial records is similar to the public's right of access to legislative and executive branch records. As the Court noted in *Craig v. Harney*, 331 U.S. 367, 374 (1947), "[t]here is no special perquisite to the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." Indeed, courts long have recognized "that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system." *Siedle v. Putnam Investment, Inc.*, 147 F.3d 7, 10 (1st Cir. 1998). And at least one court has even suggested that "[t]he appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st. Cir. 1987).

The Supreme Court observed in *Nixon* that "the decision as to access [to judicial records] is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S. at 599. Based on this guidance, the Eighth Circuit in *United States v. Webbe*, 791 F.2d 103, (8th Cir. 1986), declined to "adopt in toto" the lead of the majority of Circuits that recognize a "strong presumption" in favor of the common law right of public access to court records. *Id*. Instead, the Eighth Circuit favors

---

knowledge gives." Like the First Amendment, then, the right of inspection serves to produce "an informed and enlightened public opinion." Like the public trial guarantee of the Sixth Amendment, the right serves to "safeguard against any attempt to employ our courts as instruments of persecution," to promote the search for truth, and to assure "confidence in . . . judicial remedies."

*Id*.

11

giving deference to the determination of the district court: "'When the concern is the efficient administration of justice and the provision to defendants of fair trials, the consideration of competing values is one heavily reliant on the observations and insights of the presiding judge.'" *Id.* (quoting *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 431-34 (5th Cir. 1981)). This holding was subsequently reaffirmed in *United States v. McDougal*, 103 F.3d 651, 657 (8th Cir. 1996).[7] Thus, the Eighth Circuit has adopted a standard that more evenly balances the danger of improper use against the right of public access.

Although the Eighth Circuit has not adopted the "strong presumption" standard, the court as recently as March of this year instructed that "[a] compelling governmental interest permits a court to take evidence under seal *as long as* the court makes specific findings regarding the necessity of such a step." *Goff v. Graves*, 362 F.3d 543, 550 (8th Cir. 2004)(emphasis added). The Eight Circuit in *Goff* did not articulate any factors to consider when deciding whether to seal court records. However, in *In re Search Warrant for Secretarial Areas Outside Office of Thomas Gunn*, 855 F.2d 569, 574 (8th Cir. 1988), the Eight Circuit held that "'[p]roceedings may be closed and, by analogy, documents may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to that interest.'" *Id.* (quoting *In re New York Times Co*, 828 F.2d 110, 116 (2d Cir. 1987)(internal quotation marks omitted). The court

---

[7]     The United States Courts of Appeals for the First, Second, Third, Seventh, Ninth, Eleventh and District of Columbia Circuits have adopted the "strong presumption" standard. *In re Providence Journal, Co.*, 293 F.3d 1, 10 (1st Cir. 2002); *United States v. Graham*, 257 F.3d 143 (2d Cir. 2001); *United States v. Criden*, 648 F.2d 814, 823 (3d Cir. 1981); *United States v. Guzzino*, 766 F.2d 302, 304 (7th Cir. 1985); *San Jose Mercury News, Inc. v. United States District Court-Northern District*, 187 F.3d 1096, 1102 (9th Cir. 1999);; *United States v. Rosenthal*, 763 F.2d 1291, 1294 (11th Cir. 1985); *In re National Broadcasting Co*, 653 F.2d 609, 613 (D.C. Cir. 1981). The United States Court of Appeals for the Fifth, Sixth and Eighth Circuits have rejected the "strong presumption" standard. *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 433-34 (5th Cir. 1981); *United States v. Beckman*, 789 F.2d 401, 414 (6th Cir. 1986); *United States v. Mc Dougal*, 103 F.3d 651, 657 (8th Cir. 1996).

added:

> If the district court decides to close a proceeding or seal certain documents, it must explain why closure or sealing was necessary and why less restrictive alternatives were not appropriate. *Press-Enterprise I*, 464 U.S. at 510-11, 104 S. Ct. at 824-25. The district court's findings must be specific enough to enable the appellate court to determine whether its decision was proper; if the district court decides that a restriction of the first amendment right of access is warranted, the district court can even file its statement of reasons and specific findings under seal. *See In re Washington Post Co.*, 807 F.2d at 391; *In re Application of Herald Co.*, 734 F.2d at 101.

*In re Search Warrant for Secretarial Area*, 855 F.2d at 574.[8]

In *United States v. Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1981), the D.C. Circuit identified six factors that might act as a guide in determining whether to seal court records. They are: (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identify of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings. *Id*. Each of these factors is addressed below.

  1. The need for public access to the documents at issue

To prevail under 18 U.S.C. § 4246, the United States must introduce sufficient testimony and exhibits to meet the elements of the statute by clear and convincing evidence. At the September 1, 2004 hearing, the United States called Dr. Simcox to testify about Helder's mental state and the danger he presents. Exhibits 2-16 were introduced during Dr. Simcox's testimony to provide the

---

[8]   The Eighth Circuit's reference to a "first amendment right of public access" is based on its holding that a qualified First Amendment right of public access extends to documents filed in support of a search warrant in a criminal proceeding. While the case currently before this Court is a civil matter, the guidance regarding the making of specific findings provided in *In re Search Warrant for Secretarial Area* would logically apply here.

underlying basis for his opinions and to substantiate his testimony.  Given the import of these

documents, the public should have access to them to understand the basis of the government's case

and to assure the trustworthiness of the testimony presented.  As the court explained in *Littlejohn*

*v. BIC Corp.*, 851 F.2d 673, 678 (3d. Cir. 1988):

> The public's exercise of its common law right in civil cases promotes
> public confidence in the judicial system by enhancing testimonial
> trustworthiness and the quality of justice dispensed by the court.  *See*
> 6 J. Wigmore, *Evidence* § 1834 (J. Chadbourne rev. 1976).  As with
> other branches of government, the bright light cast upon the judicial
> process by public observation diminishes possibilities of injustice,
> incompetence, perjury, and fraud.  Furthermore, the very openness of
> the process should provide the public with a more complete
> understanding of the judicial system and a better perception of its
> fairness.  *See, e.g., Bank of America Nat. Trust v. Hotel Rittenhouse*,
> 800 F.2d 339, 345 (3d Cir. 1986)(*Bank of America*).

*Littlejohn v. BIC Corporation*, 851 F.2d 673, 678 (3d Cir. 1988).  *See also Reporters Committee for*

*Freedom of the Press*, 773 F.2d at 1352 (Wright, J. dissenting) ("court records often provide

important, sometimes the only, bases or explanation for a court's decisions.").

2.  The extent of previous public access to the documents

None of the records at issue has been previously released to the public.  The forensic report

and risk assessment that were provided to the District Court in Iowa are not contained in the public

court file.  Thus, this factor does not provide support for disclosure.

3.  The fact that someone has objected to disclosure, and the identity fo that person

Helder is the only person seeking to seal Exhibits 2-16.  No third party is seeking to seal the

Court's records.  In *Hubbard*, the court found that non-disclosure is best-suited in cases where the

person advocating for non-disclosure is a third-party to the litigation.  The court wrote: "We think

that where a third party's property and privacy rights are at issue the need for minimizing intrusion

14

is especially great and that the public interest in access to materials . . . is especially small."

*Hubbard*, 650 F.2d at 425.  Here, no such third party interest is at stake.

    4.  <u>The strength of any property and privacy interests asserted</u>

Helder objects to the unsealing of Exhibits 2-16 because they contain private medical information.  The United States recognizes the private nature of medical records in general.  However, in this instance the records are a necessary component of the government's case.  It is not, therefore, some inappropriate purpose that motivates the United States to introduce these exhibits into evidence.  Indeed, the records were compiled at the behest of the United States District Court in Iowa as part of the § 4241 and § 4246 proceedings.

To the extent Helder contends that Exhibits 2-16 are somehow protected by the psychotherapist-patient privilege, the United States rejects this contention.  That privilege, recognized by the Supreme Court in *Jaffee v. Redmond*, 518 U.S. 1 (1996), is based on the confidential relationship between a psychiatrist and his or her patient.  The Court noted:

> Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace.  For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

*Id*. at 10.  Here, no such traditional psychotherapist-patient relationship exists.  Helder did not voluntarily seek psychotherapy (indeed, he denies he is mental ill), nor did the doctors assume their roles in the traditional sense.  Instead, the United States District Court for the District of Iowa ordered FMC Rochester to evaluate Helder to determine whether he is competent to stand trial and whether he is dangerous.  The psychiatric, psychological, psychosocial and risk assessment evaluations contained in the record, along with the supporting medical documentation, were thus

compelled by the judicial process and not the product of the traditional psychotherapist-patient relationship underlying the *Jaffee* decision.

Not only did Helder not voluntarily enter into a traditional psychotherapist-patient relationship, he was specifically advised during all of his evaluations that he did not enjoy a confidential relationship with the medical staff at FMC Rochester. As noted in Exhibits 2, 5, 6, 8, and 16, Helder was informed during each evaluation that the usual doctor/patient confidentiality did not apply, that the information obtained during the evaluation would be submitted to the court, and that although he was required to participate in the court-ordered evaluation, he could refuse to discuss any topic. Helder consistently acknowledged that he understood these conditions and was compliant during the evaluations.[9] Thus, Helder cannot reasonably claim an expectation of privacy as that contemplated by the Court in *Jaffee*.

Finally, and most importantly, if Helder were permitted to invoke the psychotherapist-patient privilege, he would render 18 U.S.C. § 4246 a nullity. The statute contemplates that the United States prepare a risk assessment report and that a copy be provided to the Court. *See* 18 U.S.C. § 4246 ("Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court.").[10] The statute further requires the United States to establish all three elements by clear and convincing evidence. In this case, the evidence presented was in the form of Dr. Simcox's testimony and Exhibits 2-16 – all of which were largely based on mental health providers'

---

[9] Exhibits 3 and 4 were reports prepared at Helder's request and voluntarily submitted by him to the Court. Thus, even if Helder could invoke the psychotherapist-patient privilege, he waived it with respect to these reports.

[10] 18 U.S.C. § 4246 directs that the report be filed with the Court. Significantly, it does not state that the report be filed under seal.

discussions with, and evaluations of, Helder.  If Helder were able to invoke the psychotherapist-patient privilege, it would prevent the disclosure of the risk assessment report and all of the other evidence needed to prove the government's case.  If such were the case, Dr. Simcox's testimony and the exhibits at issue could not even come into evidence.  This clearly is not – and cannot be – the law.[11]

     5.  <u>The possibility of prejudice to those opposing disclosure</u>

The Supreme Court recognized in *Nixon* that the public right of access to court records may be denied where prejudice may result to those opposing disclosure.  *Nixon*, 435 U.S. at 597-98.  The Court noted that "access has been denied where court files might have become a vehicle for improper purposes."  For example, the Court stated that non-disclosure may be appropriate when records are "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case . . . ," where the records "may serve as reservoirs of libelous statements for press consumption," or where the records "are used as a sources of business information that might harm a litigant's competitive standing . . . ." *Id.  See also Hubbard*, 650 F.2d at 315-16 ("The public has in the past been excluded, temporarily or permanently, from court proceedings or the records of court proceedings to protect private as well as public interests: to protect trade secrets, or the privacy and reputation of victims of crimes, as well as to guard against risks to national security interests and to minimize the danger of unfair trail by adverse

---

[11]    The United States recognizes that the forensic reports, psychiatric and psychosocial evaluations, and the risk assessment contain private information, particularly to the extent they disclose the identity of individuals who were interviewed by law enforcement and FMC-Rochester staff.  To the extent the Court is concerned about the disclosure of the identity of these individuals, it would seem that redaction of their names, as opposed to non-disclosure of all of the exhibits, is the more appropriate, less restrictive, alternative. *See In re Search Warrant for Secretarial Area*, 855 F.2d at 574 (courts must explain why sealing is necessary and why "less restrictive alternatives [are] not appropriate.").

publicity.")(footnotes omitted).  None of the concerns discussed in *Nixon* present themselves here, and the United States cannot foresee any improper use of the records.

Helder may argue that self-incriminating statements contained in the records may be used against him if he ever stands trial.  The appropriate forum in which to address that concern, however, is in the District Court in Iowa (or wherever else Helder may stand trial).  If Helder stands trial, the trial judge can make the appropriate rulings on the admissibility of any self-incriminating statements, and may even chose to seal the documents to avoid adverse pretrial publicity.

6.  The purposes for which the documents were introduced during the judicial proceedings

Exhibits 2-16 were introduced during the hearing because they are essential to the government's case.  Exhibits 2-16 form the basis of Dr. Simcox's opinions.  They represent the underlying data that informs the opinions he rendered.  Given the import of the exhibits, the United States submits that the public has a right to examine those records to assure that the testimony presented conforms to the content of the records, and that the court's subsequent decision accurately interpreted those records.  As the court noted in *Littlejohn*, 851 F.2d at 678, the disclosure of court records enhances testimonial trustworthiness and the quality of justice dispensed by the courts.[12]  *See also Reporters Committee for Freedom of the Press*, 773 F.2d at 1352 (Wright, J. dissenting)("[C]ourt records often provide important, sometimes the only, bases or explanations for

---

[12]      The government recognizes that it now routinely requests that risk assessment reports (and the psychiatric evaluations in § 4245 proceedings) be filed under seal upon the filing of the petition.  This request is made because there is a possibility that a hearing will not take place.  For example, if state placement is found before a  § 4246 hearing is held, the United States would naturally withdraw its petition.  Similarly, if a patient voluntarily consents to treatment after a § 4245 petition is filed, the petition would likewise be withdrawn.  In instances where a hearing is not necessary, the disclosure of the reports would have been unnecessary.  However, once the hearing commences, the documents become essential to the government's case.  Thus, the government's request that psychiatric reports and risk assessments be sealed upon the filing of a § 4245 or § 4246 petition is not inconsistent with its request that they be unsealed during the hearing.

18

a court's decisions.").

## III. CONCLUSION

For the foregoing reasons, the United States requests that Helder be committed to the custody

of the Attorney General under 18 U.S.C. § 4246 and that the Court unseal Exhibits 2-16.

Dated:  September 10, 2004                              Respectfully submitted,

                                                       THOMAS B. HEFFELFINGER
                                                       United States Attorney


                                                       s/ Perry F. Sekus
                                                       By: Perry F. Sekus
                                                       Assistant U.S. Attorney
                                                       Attorney ID Number 0309412
                                                       600 U.S. Courthouse
                                                       300 South Fourth Street
                                                       Minneapolis, MN 55415
                                                       (612) 664-5600