UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

      Petitioner,

vs.

Lucas John Helder,

      Respondent.

Civil No. 04-3161 JRT/FLN

**REPORT AND
RECOMMENDATION**

---

Perry F. Sekus, Assistant United States Attorney, for the Government.
Scott Tilsen, Assistant Federal Public Defender, for Lucas John Helder.

---

**THIS MATTER** came before the undersigned United States Magistrate Judge on September 1, 2004, for a hearing at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"), on the Government's Petition to Determine Present Mental Condition of Respondent Lucas John Helder under Title 18 U.S.C. § 4246.  The Government ("Petitioner") seeks to commit Respondent Mr. Helder ("Respondent" or "Helder") to the custody and care of the Attorney General until suitable state placement is available or Respondent's condition improves.  Petitioner called two witnesses and introduced 17 exhibits into evidence.  Exhibits 2-16 were placed under seal.  Respondent Helder was present at the hearing but did not testify or call any witnesses.  Petitioner maintains that Respondent suffers from a mental disease or defect such that his release from custody would create a substantial risk of bodily injury to others or serious property damage as a result of his mental illness.  Accordingly, Petitioner seeks an Order committing Respondent to the custody of the Attorney General for hospitalization and continued treatment pursuant to 18 U.S.C. § 4246.

-1-

## I.  FINDINGS OF FACT

Respondent Helder  was born May 5, 1981, in St. Paul, Minnesota.  (Gov. Ex. 2, p. 3).  He was adopted and raised in Pine Island, Minnesota, graduating from Pine Island High School in 1999.  Id.  During high school, he attended Rochester Community and Technical college.  Id.  Upon graduation, he transferred to University of Wisconsin-Stout.  Id.  There is no indication that he had any behavioral or psychological problems while growing up.  (Gov. Ex. 16, p. 2).  The only interactions with mental health professionals began after Helder was arrested for the instant offense.  Reports are unanimous in opining that he suffers from a psychotic disorder.  (Gov. Ex. 2, p. 7.)

In May 2002, Respondent Helder made a five day journey placing 18 pipe bombs in mailboxes in Illinois, Iowa, Nebraska, Texas, and Colorado. (Gov. Ex. 4, p. 9).  Some of the bombs exploded injuring several people.  Id.  Helder was arrested on May 7, 2002, after a high-speed car chase in Nevada.  Id..  He was charged in the U.S. District Court for the Northern District of Iowa with violations of 18 U.S.C. §844(i) and §924(c).  (Gov. Ex. 16, p. 1).  These charges involve utilizing explosives to damage property and possessing a fire arm during a crime of violence.  Id.

At the request of the Federal Public Defender's Office, Helder was examined by Thomas H. Jobe, M.D. on June 24, 2002.  (Gov. Ex. 2, p. 8). Dr. Jobe indicated that although Helder seemed fully oriented and cooperative, his mood was "inappropriately elated" and he seemed to fail to "appreciate the gravity of the charges that were likely to be filed against him."  Id.  His speech was pressured and illogical, and he had non-bizarre, paranoid, and grandiose delusions.  Id.  Dr. Jobe opined that Helder had experienced a manic episode in April 2002, before the offenses occurred and

diagnosed Helder with Schizoaffective Disorder, Bipolar Subtype. Id.

In July 2002, Helder was evaluated by Psychologist John Mundt also at the request of the Federal Public Defender. (Gov. Ex. 4). Dr. Mundt noted that early in college, Helder reported becoming interested in ghosts, out-of-body experiences, astral projection, and other spiritual and psychic phenomenon that shaped his views and belief system, which in turn, spurred his actions in the instant offenses. Id. at 5. Helder explained that the urgency of his spiritual beliefs and the need to call attention to them climaxed in the spring of 2002. Id. He reported first formulating the pipe-bomb plan in April 2002, under the notion that it would draw mass attention to his beliefs and he would be able to teach the rest of humanity. Id. at 6. As he does not believe in death, he did not view the harm his actions caused as anything but inconvenient and necessary possible consequences to achieve his larger plan. Id. at 6. Dr. Mundt diagnosed Helder with Schizoaffective Disorder as evidenced by delusions of out-of-body experiences, astral travel, ghosts, both auditory and visual hallucinations, as well as both manic and major depressive episodes. Id. at 14.

A second evaluation by Dr. Jobe on September 12, 2002, as a supplement to his initial report, described more of Helder's beliefs. (Gov. Ex. 3.). Dr. Jobe concluded that Helder was "not able to appreciate the nature and quality of the wrongfulness of his acts." Id. at 10.

On February 19, 2003, Helder was sent to FMC Rochester to undergo evaluations to determine if he was competent to stand trial. (Gov. Ex. 2, p. 1; Gov. Ex. 16, p. 1). From February 19, 2003, through April 17, 2003, Respondent Helder underwent a series of clinical interviews. In April 2003, doctors at FMC submitted a competency evaluation based on the interviews, a review of the records in the case, ongoing informal interactions, collateral interviews with Helder's father, as well as psychological tests and laboratory studies. Id. Respondent Helder was diagnosed with

Schizoaffective disorder, Bipolar subtype and a Cannabis Dependency.  Id. at p. 16.  The doctors at FMC Rochester found that Helder's competency was not expected to change in the near future without psychiatric intervention and recommended that he be committed for further evaluation and treatment under Title 18, U.S.C.§ 4241(d) for restoration of competency.  Id.

From the period of May 2003, through March 30, 2004, Respondent Helder underwent two more Forensic Evaluations, a Psychiatric Evaluation and a Psychosocial Assessment.  (Gov. Ex. 5, Forensic Evaluation dated 8-22-03, and Gov. Ex. 6, Forensic Evaluation dated 1-9-04; Gov. Ex. 7, Psychiatric Evaluation dated 5-22-03; and Gov. Ex. 8, Psychosocial Assessment dated 5-30-03). He was treated by a multi-disciplinary team including a psychiatrist, psychologist, a social worker, activity therapists, and nursing staff.  (Gov. Ex. 16, p. 1).  He also accepted trials with four different antipsychotic medications and participated in group therapies aimed at improving his understanding of his mental health problems, reducing his symptoms and preparing him to stand trial.  Id. at 5.

In early April, a final competency hearing was conducted and the Court in Iowa found that there was not a substantial probability his competency would be restored in the foreseeable future. Id. at 5.  Despite having a good factual understanding of the criminal proceedings, it was found that Helder's psychotic illness continued to impair his judgement, logic, and ability to rationally understand the trial process.  (Gov. Ex. 5, p. 4).  He did not believe he was mentally ill or that his ideas would seem irrational to other people.  Id. at 5.  Helder saw a trial as a mechanism to deliver his message and his delusional beliefs still made him to act in ways that may not be helpful to his defense.  Id.  As a result, doctors recommended that Helder stay at the FMC facility for continued commitment under Title 18 U.S.C. § 4246(b), to determine if he suffered from a mental disease or defect such that his release from custody would create a substantial risk of bodily injury to another

person or serious damage to the property of another. (Gov. Ex. 6., p. 8).

On April 20, 2004, Respondent Helder was seen by the Risk Assessment Panel consisting of Doctors Daniel Shine and Andrew Simcox, the Chief of Psychology at FMC Rochester. (Gov. Ex. 16). The purpose of the Assessment was to determine whether or not Respondent Helder is presently suffering from a mental disease or defect as the result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another. Id. Mr. Helder's initial diagnosis of Schizoaffective Disorder Bipolar Type with a Cannabis Dependency was corroborated and the panel opined that Respondent Helder did, indeed suffer from a mental disease or defect as a result of which his release from custody would create a substantial risk of bodily injury to another person or serious damage to the property of another. Id. at 7-9. In making this determination, the panel weighed three factors: (1) Helder's history of violent behavior as a predictor of future violent behavior; (2) the relationship between past violent behaviors and the symptoms of mental illness; and (3) Helder's present mental status, including degree of symptom remission and insight into own problems. Id. at 8. The panel found that Helder's response to medications had been minimal and he remained delusional and significantly impaired by his mental illness. Id. Helder does not believe that he is mentally ill or that his substance abuse might negatively affect him. Id. If released, he would likely discontinue medications and resume his use of marijuana. Id. As a result, his mental status would deteriorate. Id. Furthermore, he continues to believe he has a "moral obligation to help 'illuminate' others," and that a "pending 'ascension' will be prompted by mass enlightenment with the 'effect of heaven on Earth'." Id. The panel noted that these ideas are grandiose delusions caused by his psychotic illness and the bombings were directly linked to his mental illness. Id.

On July 8, 2004, the United States filed an 18 U.S.C. § 4246 Petition [#1] with this Court, and on September 1, 2004, a hearing was held on the Petition. At the hearing, Petitioner presented two witnesses: Dr. Andrew Simcox, the Chief of Psychology at FMC Rochester and Pam Young, a licensed social worker at FMC Rochester. Dr. Simcox testified that he evaluated Helder on various occasions including his initial evaluation upon arriving to FMC and the two Forensic Evaluations after his arrival. (Gov. Ex. 2, 5, and 6); (Testimony of Andrew Simcox, "Simcox Test"). He was also a member of the Risk Assessment Panel (Gov. Ex. 16) and continues to monitor Helder's progress. (Simcox Test.).

Dr. Simcox testified that he personally interviewed the Respondent on several occasions. He also reviewed the past medical reports, the legal documents related to the criminal case, and spoke to the Respondent's attorneys and parents. Id. At the hearing, Dr. Simcox opined that Helder suffers from a mental disease, namely Schizoaffective Disorder, with a Bipolar Subtype. Id. He testified that this disorder was characterized by times of Affective Disorder, such as major depression and/or manic episodes, concurrent with Schizophrenia. Id. He testified that this diagnosis concurred with opinions of his colleagues at FMC Rochester as well as the past evaluations in the medical file. Id.

Dr. Simcox testified that Helder's affective disorder centered on hypo-manic episodes that were more active while not in custody and first detained. Id. However, Helder still exhibited these symptoms as characterized by his pressured speech, grandiose and enhanced feelings of self worth or well being, as well a inappropriately positive affect given his situation. Id. Respondent's Schizophrenic symptoms included disorganized and illogical ideas, breaks with reality, delusions, hallucinations, and a decline in functioning. Id.

-6-

At the hearing, Dr. Simcox identified only a sampling of Respondent's beliefs which were characterized as delusional Schizophrenic symptoms. Id. Among them was Helder's belief in the ascension of the Earth in 2011, when the Earth will move from the 3rd dimension to the 5th, it will experience the coming of Christ, and the result will be heaven on Earth. Id. Also indicative of delusional thought is Helder's belief in the "100th Monkey Syndrome" which theorizes a common consciousness among people and a critical mass gaining a common awareness. Id. Dr. Simcox opined that for Helder, his actions were critical to create such an awareness and promote the "ascension." Id. Respondent also believes in Astro-projection and that he is capable of leaving his body and traveling around through higher dimensions. Id. Respondent was unable to "travel" upon Dr. Simcox's request, but this inability did not impact his beliefs. Id. Dr. Simcox went on to explain that Helder does not believe that death exists, rather, people are released to a higher dimension like ghosts. Id. In addition, Respondent believes in a world authority through which there is a conspiracy to keep certain information and a greater awareness from the masses. Id. These examples were only a few of Helder's beliefs that Dr. Simcox found most relevant to the question of Helder's possible future risk as they are the same beliefs that Respondent had at the time of the bombings and which motivated such action. Id.

During his testimony, Dr. Simcox stated that when determining Helder's potential risk if released, he looked at the three risk factors mentioned above. Id. He testified that Helder's history of violence was a factor in determining his future risk potential. Id. Dr. Simcox noted that the bombs inflicted significant injuries and had the potential for death which Helder was aware of but did not appreciate because he did not believe in death. Id. Dr. Simcox testified that Helder's behavior was specifically related to his mental illness. Id. His delusions and confused logic were

responsible for Helder's actions. Id. Finally, Dr. Simcox noted that Helder's current mental status had improved only mildly with multifaceted treatment. Id.

Dr. Simcox also opined that Helder's release might foster other negative factors such as Helder's continued substance abuse. Id. Dr. Simcox stated that Helder had a severe marijuana addiction and there was a fair probability that, if released, he would start using the substance again which would, in turn, negatively affect his mental status and create a high risk of relapse into his delusional thinking. Id. In reference to Helder's use of medications, Dr. Simcox noted that he was generally compliant but because Helder did not recognize that he suffers from a mental illness he would be less likely to take medications voluntarily. Id. The high probability of Helder relapsing into substance abuse, was also a factor weighing against his continued use of medication if released. Id. In addition to Helder's history of violence, Dr. Simcox stated that Helder was adept at making explosives and had a history of weapon use. Id. Dr. Simcox also noted that Helder's violence was directed towards random strangers as opposed to one specific person. Id.

Dr. Simcox also noted the factors in Helder's favor, including a supportive social network, Helder's pattern of sharing his thoughts with others, and that he lacked angry or impulsive traits. Id. Despite these benefits, Dr. Simcox still opined that Helder had a mental illness that he does not recognize, and if released, there was a higher probability that he would discontinue his medication, relapse into substance abuse, and his mental status would deteriorate. Id.

Dr. Simcox concluded that Helder is suffering from a mental disease or defect such that his release would create a substantial risk of bodily injury to another person or serious damage to the property of another as a result of his mental illness. Id. He also testified that FMC Rochester was the best place to hold Respondent as it offered the ability to provide necessary treatment,

medication, and access to family visits.  Id.

At the hearing, Petitioner also called Pam Young, a licensed social worker at FMC Rochester since 1992.  (Testimony of Pam Young, "Young Test.").  Ms. Young testified that one of her duties is to place inmates into suitable state facilities.  Id.  She testified that she was familiar with Respondent and that no suitable arrangement for state custody and care of Helder is available.  Id.

## II.  LEGAL ANALYSIS

Title 18 U.S.C. § 4246, "Hospitalization of a person due for release but suffering from mental disease or defect" states:

> "If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General."

18 U.S.C. § 4246.  Under § 4246, the government may petition to indefinitely hospitalize an individual who has been found incompetent to stand trial and is due for release but who, as a result of a mental disease, poses a significant danger to the public.  Id.; U.S. v. S.A., 129 F.3d 995, 998 (8th Cir. 1997).  The statute is "specifically designed to avert the public danger likely to ensue from the release of mentally ill and dangerous detainees."  S.A., 129 F.3d at 999.  To satisfy their burden under § 4246, the Petitioner must show by clear and convincing evidence that, because of the mental disease or defect, release of the individual would create a substantial risk of bodily injury to another person or serious damage to property of another.  18 U.S.C. § 4246(d).  To keep the individual in federal custody, the Petitioner must also show that suitable arrangements for state custody and care

are not available.  Id.[1]  The Petitioner's burden, therefore, is threefold.  It must demonstrate: (1) a mental disease or defect; (2) dangerousness if released; and (3) absence of a suitable state placement. S. A., 129 F.3d 995, 1000 (8th Cir. 1997);  See United States v. Ecker, 30 F.3d 966, 970 (8th Cir. 1994).  This Court finds that the Petitioner has met its burden in this case.

## A.    Respondent Helder suffers from a mental disease or defect.

The evidence that Helder suffers from a mental disease or defect is overwhelming.  Almost every report agrees that Helder suffers from a psychotic disorder.  (Gov. Ex. 2, 3, 4, 5, 6, 7, 8, 16) He has been diagnosed repeatedly with Schizoaffective Disorder with a Bipolar subtype and Cannabis Dependency. Id.  The final Risk Assessment panel and report concurred with this repeated diagnosis.  (Gov. Ex. 16).  Dr. Simcox's testimony further supported a finding that Helder suffers from that mental disease.  (Simcox Test.).  Furthermore, while it is evidence that Respondent does not believe he suffers from any mental disorder he has submitted no evidence to contest this diagnosis or argue that he does not suffer from a mental disorder.  As such, this Court finds that Petitioner has met their burden under this first element of § 4246, and shown by clear and convincing evidence that Respondent Helder suffers from a mental disorder.

## B.    Respondent Helder presents a danger to person or property if released.

The Ecker court listed six factors determinative of the danger posed by a defendant.  The factors include: (1) a history of dangerousness; (2) a history of drug or alcohol use; (3) identified potential targets; (4) previous use of weapons; (5) any recent incident manifesting dangerousness;

---

[1]  Under 18 U.S.C. § 4246(d), if the court finds that respondent suffers from a mental disease or defect satisfying the statute's standards, the court is to release respondent for treatment to the appropriate official of the state where respondent is domiciled or was tried.  If that state will not assume responsibility for appropriate care, then the government maintains custody of respondent in a federal facility.

and (6) a history of problems taking prescribed medicines.  Id.

### 1. History of Dangerousness

Dr. Simcox testified at the September 1, 2004, hearing that Respondent Helder had a history of violence as evidenced by concocting a pipe-bomb plan that injured several people and had the potential to cause death.  (Simcox Test.).  He testified that because of Helder's delusions regarding death, he did not appreciate the dangerousness of his conduct.  Id.  Dr. Simcox testified that Helder's beliefs and mental illness were significant motivators, if not direct causes, of his dangerous conduct.  Id.  Furthermore, of particular relevance to future risk, Dr. Simcox testified that despite treatment, Helder persists in the same delusional beliefs that motivated the May 2002 bombings.  Id.  Dr. Simcox also made significant note of Respondent's lack of insight into his disease, which results in his refusal to accept that he suffers from a mental disease and therefore a lack of appreciation for his past conduct.  Id.  Although Respondent has not shown any violent behavior since his arrest, overt acts of violence by an inmate are not required before a § 4246 petition can be granted.  U.S. v. Steil, 916 F.2d 485 (8th Cir. 1990).

### 2. History of Drug or Alcohol Use

Several reports as well as Dr. Simcox's actual testimony indicate that Respondent has a history of both drug and alcohol abuse.  Reports indicate that Respondent had been smoking marijuana continuously for a time before and during the offense.  (Gov. Ex. 4).  He also reported social drinking since the beginning of college, smoking opium on an opportunistic basis, and trying Psilocybin mushrooms.  Id.  Several of Respondent's reports specifically include a diagnosis of Cannabis Dependency.  (Gov. Ex. 2, 5, 6, 7, 8, 16).  Dr. Simcox stated that if Helder were to be released that there was a high probability that his substance abuse would continue thereby affecting

and contributing to a deterioration of his mental state.  (Simcox Test.).

### 3.     Identified Potential Targets

Dr. Simcox testified that Respondent Helder views society as a whole as potential targets and necessary recipients of his message and beliefs.  (Simcox Test.).  Although reports indicate that Helder initially planned on killing a famous person to draw attention to his beliefs, the pipe-bombs were directed at random strangers.  (Gov. Ex. 16, p. 4; Simcox Test.).

### 4.     Previous Use of Weapons

The reports indicate that Respondent has used knifes and guns to hunt with in the past.  Id. In addition, however, Respondent began constructing bombs when he was 14 years old, he damaged at least one mailbox while a teenager, he planted 18 bombs during the current offense, and he possessed a gun at the time of his arrest.  Id.  Respondent's previous use of weapons and familiarity with explosives is a factor that weighs in favor of finding that he presents a risk of dangerousness to person or property if released.

### 5.     Any Recent Incident Manifesting Dangerousness

Since his arrest for the ongoing offense, Respondent Helder has not engaged in any recent incident manifesting dangerousness.  However, the evidentiary value of this fact is minimized because since his arrest he has been held in a controlled setting and most recently at FMC Rochester. See S.A., 129 F.3d at 1001 (courts recognize that an inmate confined to a controlled setting like a prison has minimal opportunity to engage in violent behavior).

### 6.     A History of Problems Taking Prescribed Medicines

Possible noncompliance with prescription medicinal treatment is a "major factor" in determining dangerousness.  Ecker, 30 F.3d at 969.  Even a high likelihood of discontinued use is

relevant to finding risk of dangerousness if released.  See, e.g., United States v. Evanoff, 10 F.3d 559, 562 (8th Cir. 1993)(upon release, inmate would "likely discontinue prescribed psychotropic drugs").

Dr. Simcox testified that although Respondent is cooperative in taking his prescribed medications, he opines that he would not continue to take his medications if released.  (Simcox Test.)  The fact that Helder does not recognize that he is mentally ill is highly indicative that he would not see the need to continue his medication voluntarily if released.  Id.  Also relevant is the likelihood that Helder would relapse in his substance abuse, which would only serve to feed his delusional beliefs and decrease the chances of continuing use of his medications.  Id.

In any event, Dr. Simcox testified that Respondent's medication has not been successful in providing him any insight into his mental illness.

### 7.   Conclusion Regarding Dangerousness

Despite the lack of evidence supporting recent incidents of dangerousness and Respondent's generalized target, Petitioner has satisfied the second element if § 4246, and established by clear and convincing evidence that there is a substantial risk that Respondent will be a danger to the community if released at this time.   Respondent's history of violence, combined with the findings that his mental illness was a motivating factor in his actions and that the same delusional beliefs persist, suggest that his release would create a substantial risk of bodily injury to another person or serious damage to property of another.  This conclusion is supported by Respondent's history of drug and alcohol abuse, familiarity with weapons and explosives, and a lack of insight into his mental illness which indicates a high likelihood of discontinued use of prescribed medications if released.

**C.      There is no suitable state placement available for Respondent Helder.**

This Court also finds that Petitioner has satisfied the third element of §4246(b) by adequately showing that suitable arrangements for state custody and care are not available for Respondent Helder.  Petitioner's witness Pam Young testified that it is her duty to find such placement and despite her efforts, no such arrangement for state custody and care of Helder is available.  (Young Test.).  Dr. Simcox testified that FMC Rochester is the best location for Helder due to the ability to monitor his treatment as well as his access to familial support.  (Test. Simcox).  Furthermore, Respondent has presented no evidence or argument to contest this finding.

This Court finds that the Petitioner has established by clear and convincing evidence the three elements necessary to commit Respondent Helder pursuant to 18 U.S.C. § 4246.  The evidence overwhelmingly shows that Respondent Helder suffers from a mental disease or defect known as Schizoaffective Disorder of a Bipolar Subtype, and Cannabis Dependency.  This Court also finds that this mental disease, is significantly related to and indeed motivated, the underlying conduct that gave rise to the charges.  There is no evidence that any treatment has worked to diminish the risk that, were Respondent to be released, a similar incident or other damage to person or property, would not occur.  Accordingly, this Court recommends that an Order be issued committing Respondent to the custody of the Attorney General for hospitalization and continued treatment until suitable state placement may be found, or until his release no longer constitutes a substantial risk of bodily injury to another person or serious damage to the property of another pursuant to 18 U.S.C. § 4246.

### III.  RECOMMENDATION

Based upon the files, records, and proceedings herein, it is hereby **RECOMMENDED** that:

1.      Defendant be committed to the custody and care of the United States Attorney General pursuant to 18 U.S.C. § 4246.


Dated: <u>October 27</u>, 2004                     S/ *Franklin L. Noel*
                                                   FRANKLIN L. NOEL
                                                   United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, within ten days of this Report and Recommendation, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.